# Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007

Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007 does not prohibit DHS or OMB officials from reviewing, in accordance with established Executive Branch review and clearance procedures, the DHS Chief Privacy Officer's draft section 802 reports before the reports are transmitted to Congress.

Section 802(e)(1) is best interpreted not to prohibit DHS and OMB officials from commenting on a draft CPO report where the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect the comments or amendments from such officials.

Section 802(e)(1)'s direct reporting requirement need not be enforced in circumstances where its application would require the CPO to ignore the results of the President's review, through DHS and OMB, of a particular report. In such circumstances, the statute must yield to the President's exercise of his constitutional authority to supervise subordinate Executive Branch officers and their communications with Congress.

January 29, 2008

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF MANAGEMENT AND BUDGET
AND THE ACTING GENERAL COUNSEL
DEPARTMENT OF HOMELAND SECURITY

You have asked for our opinion regarding the constitutionality of section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, 121 Stat. 266, 360 (2007) (codified at 6 U.S.C. § 142 (Supp. I 2007)) (the "Act" or "9/11 Act"). Section 802(e)(1) provides, in relevant part, that the Chief Privacy Officer ("CPO") of the Department of Homeland Security ("DHS" or "the Department") must submit reports "directly to the Congress . . . without any prior comment or amendment by the Secretary, Deputy Secretary, or any other officer or employee of the Department or of the Office of Management and Budget" ("OMB"). 6 U.S.C. § 142(e)(1). Specifically, you have asked whether we read section 802(e)(1) to prohibit DHS and OMB personnel from reviewing, commenting upon, or amending the CPO's reports and, if so, whether such prohibitions are constitutional.[1]

We conclude, first, that section 802(e)(1) does not prohibit DHS or OMB personnel from reviewing, in accordance with established Executive Branch review

---

[1] *See* Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Gus P. Coldebella, Acting General Counsel, Department of Homeland Security (Nov. 6, 2007); Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Jeffrey A. Rosen, General Counsel, Office of Management and Budget (Sept. 25, 2007).

and clearance procedures, the CPO's section 802 reports before the reports are finalized and transmitted to Congress. The plain text of section 802(e)(1) concerns only the transmittal of reports that have been commented upon or amended by DHS or OMB officials; it does not purport to bar "review" of draft reports by such officials. Furthermore, any reading of the statute that would foreclose such review must be avoided if at all possible because of the serious constitutional issue that would arise if the statute were interpreted to interfere with the President's ability to supervise the work of the CPO through review of the CPO's draft reports by the Secretary of Homeland Security and the Director of OMB. Based upon the same principle of constitutional avoidance, we conclude, second, that the statute must be read not to prohibit DHS and OMB officials from commenting upon a draft report where, consistent with the supervisory review process, the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect the comments or amendments suggested by those officials. Third, we conclude, however, that where supervisory review by the President, through the Secretary or the Director of OMB, results in comments or amendments on a draft report by DHS or OMB personnel, the CPO must be allowed to consider and incorporate those comments and amendments in the final report in the manner contemplated by the review. If section 802(e)(1) were applied to prevent the CPO from doing so, the statute would substantially frustrate the President's exercise of his constitutional authority to supervise the actions of a subordinate executive officer (the CPO) and to supervise the content, and particularly any classified or privileged content, of official Executive Branch communications with Congress. To the extent section 802(e)(1)'s application would purport to require that result, section 802(e)(1) would be unconstitutional.

As discussed more fully below, the constitutional grounds for these conclusions are well settled and have been long recognized by all three branches. For decades, the Executive Branch has consistently objected to direct reporting requirements similar to the one at issue here on the ground that such requirements infringe upon the President's constitutional supervisory authority over Executive Branch subordinates and information. The Supreme Court and Congress have also acknowledged and respected this supervisory authority as a fundamental part of our system of government. These precedents from all three branches, and the constitutional principles they recognize, inform our conclusion that the terms of section 802(e)(1) must yield to the extent their application would interfere with the President's constitutional authority to comment upon or amend, through his subordinates at DHS or OMB, a CPO report before the report is transmitted to Congress.[2]

---

[2] If DHS establishes a policy of declining to enforce section 802(e)(1) on the constitutional grounds set forth in this opinion, DHS should report that decision to Congress as required by statute. *See* 28 U.S.C. § 530D(a)(1)(A)(i), (b), (e) (Supp. V 2005) (establishing a 30-day deadline for Executive

# I.

Congress created the position of the DHS Chief Privacy Officer in the Homeland Security Act of 2002, Pub. L. No. 107-296, § 222, 116 Stat. 2135, 2155 (2002) (codified as amended at 6 U.S.C. § 142 (Supp. V 2005)) ("HSA"). The HSA established the CPO as a "senior official" with significant operational and policy responsibilities who is appointed by, and reports directly to, the Secretary. 6 U.S.C. § 142(a)(1)–(5) (Supp. I 2007).

The 9/11 Act expands the CPO's policymaking authority and permits the CPO to investigate possible violations of privacy laws and programs in a manner consistent with the CPO's status as a senior Executive Branch official who is accountable to the President. 6 U.S.C. § 142(a)–(d) (Supp. I 2007). The provisions of the Act granting the CPO investigative authority contemplate that the CPO will have access to internal Department and Executive Branch information. *Id.* § 142(b)(1)(A). The Act also provides that in reviewing such information and in discharging his investigative and policymaking responsibilities, the CPO "shall report to, and be under the general supervision of, the Secretary." *Id.* § 142(c)(1)(A). Further, the Act states that the CPO's exercise of the statute's new grant of subpoena authority is "subject to the approval of the Secretary," *id.* § 142(b)(1)(C), and that the CPO's investigative authority is subordinate to that of the Department's Inspector General, *id.* § 142(c)(2)(B)(i).

The reporting requirements in section 802(e) were enacted as part of the 9/11 Act provisions that expanded the CPO's statutory authority as outlined above. The House version of the bill (H.R. 1, 110th Cong.) included the direct reporting provision in section 802(e)(1) as part of a broader amendment that would have permitted the CPO to issue and enforce subpoenas without the Secretary's approval, and that would have given the CPO a five-year term of office. The Administration specifically objected to these and other provisions of H.R. 1 in its comments on the bill. *See* Statement of Administration Policy on H.R. 1 (Jan. 9, 2007). The Senate subsequently amended H.R. 1 to remove the provisions granting the CPO independent subpoena authority and a five-year term, but did not alter the direct reporting language. *See* S. 4, 110th Cong. § 503 (as reported in Senate, Mar. 13, 2007). Emphasizing the Senate bill's recognition of the CPO as a senior Executive Branch policy officer, the Administration reiterated its constitu-

---

Branch departments to submit to "Congress a report of any instance in which" they "establish[] or implement[] a formal or informal policy to refrain from enforcing, applying, or administering any provision of any Federal statute . . . on the grounds that such provision is unconstitutional").

Editor's Note: On March 4, 2008, the Secretary of Homeland Security sent a letter report to Congress pursuant to 28 U.S.C. § 530D in which the Department of Homeland Security disclosed and explained its decision to implement a non-enforcement policy regarding section 802(e)(1) of the 9/11 Act based on the legal advice in this memorandum.

tional objection to the bill's direct reporting provision, which was then designated as section 503 of S. 4. *See* Statement of Administration Policy on S. 4 (Feb. 28, 2007). The Senate did not amend the provision, however, and the Senate-passed version was included in the enrolled bill as section 802(e)(1). The President signed the Act on August 3, 2007.[3]

As provided in section 802, the CPO is responsible for investigating and ensuring departmental compliance with federal privacy laws and programs, and has policymaking authority over departmental policies as well as regulatory and legislative proposals for the collection, use, and disclosure of personal information by the federal government generally. *See* 6 U.S.C. § 142(a)–(d). Section 802(e) requires the CPO to prepare an annual report to Congress that addresses the CPO's areas of statutory and policymaking responsibility, including "activities of the Department that affect privacy, complaints of privacy violations, implementation of the Privacy Act of 1974, internal controls, and other matters." *Id.* § 142(a)(6), (e). The direct reporting provision at issue here, section 802(e)(1), provides that the CPO "shall":

> submit reports directly to the Congress regarding performance of the responsibilities of the senior official under this section [the CPO], without any prior comment or amendment by the Secretary, Deputy Secretary, or any other officer or employee of the Department or the Office of Management and Budget[.]

*Id*. § 142(e)(1).

You have asked whether section 802(e)(1) must be interpreted, and, if so, whether it may constitutionally be applied, (1) to prohibit DHS and OMB officials from reviewing a draft report before it is finalized and transmitted to Congress, (2) to prohibit those officials from offering comments upon a draft report even if the comments will not be incorporated or reflected in the final report to Congress, and (3) to prohibit the CPO from considering and actually incorporating into the final report DHS or OMB comments and amendments in the manner contemplated by the President's supervisory review process.

---

[3] It is well settled that Presidents may "'approve legislation containing parts which are objectionable on constitutional grounds.'" *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 202 (1994) (quoting *INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983), and citing authorities dating back to the 1940s for the proposition that "the President's signing of a bill does not affect his authority to decline to enforce constitutionally objectionable provisions thereof").

## II.

### A.

Section 802(e)(1) is not fairly read to prohibit the CPO from submitting his draft reports for review by DHS and OMB officials before the reports are finalized and transmitted to Congress. The statute refers only to "prior comment or amendment by" DHS and OMB officials; it does not by its terms address any "review" of the draft reports by these officials. Thus, the plain language of the statute permits the CPO to share his draft report with others at DHS, including the Secretary, and to submit it for prior review to OMB, including in accordance with the established OMB clearance process that applies to Executive Branch communications to Congress relating to legislation or legislative proposals. *See* OMB Circular No. A-19, *Legislative Coordination and Clearance* (Sept. 20, 1979).[4]

Interpreting section 802(e)(1) consistent with its text to permit review of draft CPO reports by DHS and OMB officials is also compelled by the principle that statutes must be construed whenever reasonably possible to avoid raising a serious constitutional question. *See Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159, 160 (2001). Article II of the Constitution vests the executive power in the President, and makes clear that he may rely upon, and bears responsibility for the conduct of, executive officers who stand subordinate to him. The President cannot fully and effectively discharge his constitutional responsibilities if Congress may, by statute, interfere with his ability to supervise the actions of such officers, especially their communications with Congress. Accordingly, we have long recognized that statutes that interfere with the President's ability to supervise, directly or through subordinate officials, the Executive Branch's communications with Congress raise serious constitutional concerns. *See, e.g.*, *Authority of the Special Counsel of the Merit Systems Protection Board to Litigate*

---

[4] We understand that reports to Congress like those contemplated by section 802(e) ordinarily would be submitted to OMB for review and clearance, and that both OMB and DHS agree that the CPO's reports are subject to the requirements of Circular A-19. Circular A-19 applies, among other things, to "any comment or recommendation on pending legislation included in an agency's annual or special report," *id.* ¶ 5(e), and the CPO's reports must address the CPO's responsibilities under the Act, which include "evaluating legislative and regulatory proposals involving collection, use, and disclosure of personal information by the Federal Government," 6 U.S.C. § 142(a)(3) (Supp. I 2007). Although Circular A-19 excepts from the OMB clearance process "agencies that are specifically required by law to transmit their legislative proposals, reports, or testimony to the Congress without prior clearance," *id.* ¶ 4, this exception applies only to particular independent regulatory agencies that are subject to an agency-wide statutory exemption from Executive Branch clearance procedures, not to subordinate officers within a department or agency like the CPO. *See, e.g.*, 2 U.S.C. § 437d(d) (2000) (requiring Federal Election Commission to transmit budget estimates, legislative proposals, and testimony to Congress concurrently with their submission to the President or OMB); 7 U.S.C. § 2(a)(10) (Supp. V 2005) (same for Commodity Futures Trading Commission); 15 U.S.C. § 2076(k) (2000) (same for Consumer Product Safety Commission).

*and Submit Legislation to Congress*, 8 Op. O.L.C. 30, 31 (1984) ("*MSPB*") (legislation requiring an Executive Branch officer to submit budget proposals and bill comments directly to Congress represents an "unconstitutional intrusion by the Legislative Branch into the President's exclusive domain of supervisory authority over subordinate officials in the performance of their executive functions"). We therefore read statutes to avoid such interference "unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see generally MSPB*, 8 Op. O.L.C. at 34–38 (invoking this principle and the President's constitutional authority to supervise both Executive Branch subordinates and their communications with Congress in refusing to construe a statutory provision to "preclude Presidential review of [a subordinate executive officer's] proposed legislative recommendations prior to their submission to Congress"). We see nothing in section 802(e)(1)'s text, or in the legislative history of the CPO provisions of the 9/11 Act, that reveals a clear and unambiguous intent by Congress to preclude simple review of the CPO's draft reports by officials in DHS or OMB (as distinct from the transmittal to Congress of reports that reflect comments or amendments by such officials).

**B.**

Having concluded that section 802(e)(1) does not prevent DHS or OMB from reviewing the CPO's reports before they are transmitted to Congress, we next consider whether the statute is best interpreted to prohibit DHS or OMB officials from commenting upon a draft report even where, at the end of the supervisory review process, the CPO is permitted to, and in fact does, transmit a final report to Congress that does not reflect any comments or amendments by such officials. Based upon the same principle of constitutional avoidance discussed above, we conclude that section 802(e)(1) is best read not to prohibit DHS and OMB from offering comments on a draft report where those comments are not reflected in the final report as transmitted.

It appears reasonably clear from the face of the statute that Congress was most concerned in section 802(e)(1) with preventing the CPO from transmitting to Congress reports that have been revised pursuant to comments and suggestions made by officials in DHS and OMB. That intent is suggested by the statute's focus on the requirement to "submit" the report "directly" to Congress without any "prior comment or amendment" by such officials. Although the statute could be read more broadly to prohibit the transmittal of any report that has been the subject of any comment by DHS or OMB officials, even where the final report itself does not in any way reflect those comments, such a broad reading is not compelled by the plain text of the statute. We take it that Congress is most interested in the substance of the report submitted by the CPO, and the central purpose of the

statute is attempting to ensure that the substance of the report reflects the views of the CPO, rather than the views of other officials in DHS or at OMB.

In light of the ambiguity in the statute, we believe the canon of constitutional avoidance requires an interpretation that will avoid raising a serious conflict with the President's constitutional authority to supervise, through review and comment by the President's subordinates at DHS and OMB, the work of the CPO and the content of his communications to Congress. *See MSPB*, 8 Op. O.L.C. at 34–38; *Solid Waste Agency*, 531 U.S. at 160. Accordingly, where the President's supervisory review permits the CPO to transmit a final report to Congress that does not reflect suggested comments or amendments by DHS or OMB personnel, we believe that the statute is best interpreted to permit both the review and the suggested comments.

## C.

The remaining question is whether section 802(e)(1) would be constitutional if applied to prohibit the CPO from incorporating into his report comments and amendments made by DHS and OMB officials, acting in the exercise of the President's supervisory authority, where their supervisory review contemplates that the CPO will accommodate their comments and amendments in the final version of the report to Congress. We conclude that applying section 802(e)(1) to require the CPO to reject the results of the President's review of a report in such circumstances would substantially conflict with two aspects of the President's constitutional authority: the President's authority to supervise subordinate Executive Branch officers and the President's authority to protect against the unauthorized disclosure of constitutionally privileged information. This Office has for decades consistently advised that where applying a statutory provision would give rise to one or both of these serious constitutional conflicts, the Executive Branch need not enforce the provision.

## 1.

If applied in the manner described above, section 802(e)(1)'s directive that the CPO submit reports to Congress "without any prior comment or amendment" by DHS or OMB would interfere directly with the President's constitutional authority to supervise subordinate Executive Branch officers. The Supreme Court recognized the Constitution's vesting of this power in the President more than two centuries ago. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) (recognizing that the President has constitutional authority to exercise certain executive powers without interference from other branches whether he exercises those powers directly or through subordinate "officers, who act by his authority and in conformity with his orders"). Since *Marbury*, all three branches have recognized the President's constitutional authority to supervise certain Executive

Branch officers without interference from the other branches. These precedents, which we discuss below, include the Supreme Court's 1988 decision in *Morrison v. Olson* as well as decades of congressional and Executive Branch decisions. These precedents support the conclusion that statutory reporting requirements cannot constitutionally be applied to interfere with presidential supervision and control of the communications that Executive Branch officers such as the CPO send to Congress.

The constitutional authority in question was first recognized by the Supreme Court in cases involving statutory attempts to limit the President's supervision of executive officers by restricting his ability to remove them. In 1926, the Supreme Court, citing *Marbury*, elaborated on the President's constitutional authority to exercise the ultimate form of supervision—at will removal—over certain Executive Branch officers without legislative interference. *See Myers v. United States*, 272 U.S. 52 (1926). *Myers* held that a statutory "provision of the law of 1876, by which the unrestricted power of removal of first class postmasters is denied to the President, is in violation of the Constitution and invalid." *Id.* at 176. The Court based this conclusion on Article II, which "grants to the President the executive power of the Government, i.e., the general administrative control of those executing the laws." *Id*. at 163–64. The Court explained:

> If there is a principle in our Constitution, indeed in any free Constitution, more sacred than another, it is that which separates the Legislative, Executive and Judicial powers. If there is any point in which the separation of the Legislative and Executive powers ought to be maintained with great caution, it is that which relates to officers and offices.
>
> . . . .
>
> The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone.
>
> . . . .
>
> [T]o hold otherwise would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed.

*Id.* at 116, 135, 164.

Since the Court decided *Myers* in 1926, it has, on a case-by-case basis, upheld some legislative limits (specifically, statutory removal restrictions) on the President's ability to supervise certain types of officers. *See, e.g.*, *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935); *Wiener v. United States*, 357 U.S. 349 (1958); *Morrison v. Olson*, 487 U.S. 654 (1988). Importantly, however, none of these cases involved an effort by Congress to constrain the President's ability to supervise—through removal or otherwise—Executive Branch officers who, like the CPO, possess broad operational and policymaking responsibility for core Executive Branch functions.

*Humphrey's Executor* and *Wiener* upheld legislative limits on the President's ability to supervise, through removal, officers who served on "independent" commissions and performed, in the Court's words, "quasi-judicial" and "quasi-legislative" functions. *Humphrey's Ex'r*, 295 U.S. at 624, 628 (upholding removal restrictions on members of an independent agency (the Federal Trade Commission) that could not "be characterized as an arm or eye of the executive"); *Wiener*, 357 U.S. at 352 (1958) (upholding removal restrictions on War Claims Commission members charged with "adjudicatory" functions). The Court has since declared that these decisions do not undermine the constitutional analysis in *Myers* of the President's supervisory authority over Executive Branch officers such as the CPO. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 725 (1986) (in upholding "the power of Congress to limit the President's powers of removal of a Federal Trade Commissioner" in *Humphrey's Executor*, the Court "distinguished *Myers*, reaffirming its holding that congressional participation in the removal of executive officers is unconstitutional").

The same is true of the Court's decision in *Morrison v. Olson*. Although *Morrison*, unlike *Humphrey's Executor* and *Wiener*, upheld removal restrictions on an officer (the independent counsel then authorized by the independent counsel provisions of the Ethics in Government Act, which are no longer in effect) who did perform a clearly executive function (the investigation and prosecution of unlawful conduct), the decision makes clear that its analysis does not extend to the President's supervisory authority over Executive Branch officers who, like the CPO, have policymaking and other broad operational responsibility for Executive Branch functions. In upholding the relevant statute's "for cause" limits on the President's ability to remove an independent counsel, the Court emphasized that the independent counsel in question occupied a unique office characterized by "limited jurisdiction and tenure and lacking [the] policymaking or significant administrative authority" typically associated with Executive Branch officials. *Morrison*, 487 U.S. at 691. Having thus distinguished an independent counsel under the Ethics in Government Act from officers such as the CPO, the Court expressly reaffirmed the "undoubtedly correct" determination in *Myer*s that "there are some 'purely executive' officials who must be removable by the President at will if he is to 'be able to accomplish his constitutional role." *Id.* at 690 (quoting *Myers*, 272 U.S. at 132–34).

Although the Court has not had occasion (presumably for justiciability reasons) to opine on the constitutionality of statutory direct reporting requirements per se, the political branches have long recognized that statutes imposing such requirements merit the same constitutional analysis as statutes that impose removal restrictions on Executive Branch officers. The reason is that both types of statutes interfere with the President's constitutional authority to supervise the Executive Branch subordinates he relies upon to discharge his Article II functions. We have consistently cited this constitutional authority before and after *Morrison* in objecting to statutory reporting requirements functionally identical to section 802(e)(1).

In 1977, for example, the Department objected to a draft bill that would have required inspectors general to submit reports "directly to Congress without clearance or approval by the agency head or anyone else in the executive branch" as an impermissible legislative interference with the President's Article II right of "general administrative control" over executive officials, a presidential power that necessarily "includes the right to coordinate and supervise all replies and comments from the executive branch to Congress." *Inspector General Legislation*, 1 Op. O.L.C. 16, 17–18 (1977). Congress responded by deleting the offending provision, and acknowledged the Administration's separation of powers concerns in the bill's legislative history. *See Establishment of Offices of Inspector and Auditor General in Certain Executive Departments and Agencies*, S. Rep. No. 95-1071, at 9, *reprinted in* 1978 U.S.C.C.A.N. 2676, 2684 ("[T]he Committee has deleted certain features of the earlier inspector general legislation which carried the greatest potential for tension between the inspector general and the agency head, and the executive and legislative branches.").

In 1982, we raised the same constitutional objection to a statutory provision that purported to require the Administrator of the Federal Aviation Administration to submit budget estimates and comments on legislative proposals concurrently to Congress and the President. *See Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress*, 6 Op. O.L.C. 632, 641 (1982) ("*Constitutionality of Direct Reporting*"). Although we acknowledged that the text of the relevant provision "could be read to require the Administrator to submit any budget information or legislative comments directly to Congress prior to any approval or even review by the Administrator's superiors," *id.* at 639, we explained that such reporting would be "entirely inconsistent with the separation of powers" and with "the corollary right of the President to control his subordinates within the Executive Branch." *Id.* at 639–40. Accordingly, in keeping with the canon of constitutional avoidance, we interpreted the statute to apply only to final documents, thereby permitting the Administrator's superiors in the Executive Branch to review and edit preliminary drafts of the relevant reports and proposals. *See id.* at 640–41.

In 1984, we similarly advised that a statute authorizing the Special Counsel of the Merit Systems Protection Board—"an Executive Branch officer subject to the supervision and control of the President"—to submit budget proposals and bill comments directly to Congress represented an "unconstitutional intrusion by the Legislative Branch into the President's exclusive domain of supervisory authority over subordinate officials in the performance of their executive functions." *MSPB*, 8 Op. O.L.C. at 31, 35–36 (concluding that legislation that would "require an Executive Branch officer to submit budget information and legislative recommendations directly to Congress, prior to their being reviewed and cleared by the President or another appropriate reviewing official, would constitute precisely the kind of interference in the affairs of one Branch by a coordinate Branch which the separation of powers was intended to prevent").

In 1988, we reiterated this constitutional analysis in objecting (as we did in 1977) to a proposal to add a direct reporting requirement in the Inspector General Act. *See* Memorandum for Thomas M. Boyd, Acting Assistant Attorney General, Office of Legislative Affairs, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 3049; H.R. 3285; H.R. 2126* (Apr. 22, 1988) (enclosing draft letters for Representative Morris K. Udall, Chairman, Subcommittee on Energy and the Environment, Committee on Interior and Insular Affairs). As in 1977, Congress deleted the offending provision from the bill, which was enacted four months after the Supreme Court decided *Morrison v. Olson*. *See* Inspector General Act Amendments of 1988, Pub. L. No. 100-504, § 102(f), 102 Stat. 2515 (Oct. 18). At approximately the same time we objected to the Inspector General Act proposal, we concluded that a "[s]tatutory provision requiring the Director of the Centers for Disease Control to distribute an AIDS information pamphlet to the public 'without necessary clearance of the content by any official, organization or office' violate[d] the separation of powers by unconstitutionally infringing upon the President's authority to supervise the executive branch." *Statute Limiting the President's Authority to Supervise the Director of the Centers for Disease Control in the Distribution of an AIDS Pamphlet*, 12 Op. O.L.C. 47, 47 (1988).

We continued to apply the constitutional analysis underlying the foregoing precedents after the Supreme Court decided *Morrison* in June 1988 because we concluded that *Morrison* does not affect the analysis of constitutional limits on statutory restrictions of the President's ability to supervise—through removal or otherwise—Executive Branch officers like the CPO. *See, e.g.*, *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 169 (1996) ("*Constitutional Separation of Powers*") (concluding that "restrictions on the President's power to remove officers with broad policy responsibilities" should continue to "be deemed unconstitutional" after *Morrison* because the "*Morrison* Court had no occasion to consider the validity of removal restrictions affecting principal officers, officers with broad statutory responsibilities, or officers involved in executive branch policy formulation," and *Morrison* expressly

affirmed that *Myers* "was undoubtedly correct . . . in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role").

In 1989, we advised the general counsels of the Executive Branch that concurrent reporting requirements offend the separation of powers and "infringe upon the President's authority as head of a unitary executive to control the presentation of the executive branch's views to Congress." *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 255 (1989) ("*Common Legislative Encroachments*").

In 1996, we similarly advised that "concurrent reporting requirements" clearly implicate "the President's performance of his constitutionally assigned functions" and "impair the Constitution's great principle of unity and responsibility in the Executive department." *Constitutional Separation of Powers*, 20 Op. O.L.C. at 174–75 (internal quotation marks and citations omitted).[5]

In 1998, the Department notified Congress that a proposed reporting requirement virtually identical to section 802(e)(1) should be removed from a bill because the provision "would interfere with the President's control over the executive branch and with his legitimate interest in overseeing the presentation of the executive branch's views to Congress." Letter for William V. Roth, Chairman, Committee on Finance, United States Senate, and Bill Archer, Chairman, Committee on Ways and Means, United States House of Representatives, from L. Anthony Sutin, Acting Assistant Attorney General, Office of Legislative Affairs at 4 (June 8, 1998).

In 2000, we raised similar separation of powers objections to a direct reporting requirement in the Medicare Rx Act, *see* Memorandum for Robert Raben, Assistant Attorney General, Office of Legislative Affairs, from Evan H. Caminker, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 4680— Medicare Rx 2000 Act* (June 26, 2000), and Congress ultimately removed the provision from the legislation, *see* Pub. L. No. 108-173, 117 Stat. 2066 (2003).[6]

---

[5] Some might argue that our conclusions with respect to section 802(e)(1) are inconsistent with the suggestion in our 1996 opinion that "courts . . . might uphold the validity of a concurrent reporting requirement imposed for a legitimate congressional purpose on a specific agency with limited, domestic, and purely statutory duties." 20 Op. O.L.C. at 175. We disagree. In making this statement, the 1996 opinion was making an observation about how courts "might" view such a requirement with respect to agencies whose duties differ substantially from those of DHS. The opinion did not endorse the constitutionality of concurrent reporting requirements with respect to these or any other agencies. To the contrary, the opinion concluded, quoting *Myers*, that direct reporting requirements "impair the Constitution's 'great principle of unity and responsibility in the Executive department.'" *Id.*

[6] The original bill to which the Administration objected died in the Senate, but the legislation was reconsidered in the 107th Congress, *see Medicare Modernization and Prescription Drug Act of 2002*, H.R. Rep. No. 107-539 (2002), and was enacted without the objectionable provision, *see* Pub. L. No. 108-173, 117 Stat. 2066 (2003).

And, in 2004, we issued two opinions in which we concluded that two different statutory provisions, if construed or enforced to permit Executive Branch officers to communicate directly with Congress without appropriate supervision by the President or his subordinates, would violate the constitutional separation of powers and, specifically, the President's Article II authority to supervise Executive Branch personnel. *See Authority of HUD's Chief Financial Officer to Submit Final Reports on Violations of Appropriations Laws*, 28 Op. O.L.C. 248, 252–53 (2004) ("*Authority of HUD's CFO*"); *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 80–82 (2004) ("*Authority of Agency Officials*"). These opinions, like their predecessors, applied the same settled reasoning we follow here:

> The [judicial] decisions and the long practical history concerning the right of the President to protect his control over the Executive Branch are based on the fundamental principle that the President's relationship with his subordinates must be free from certain types of interference from the coordinate branches of government in order to permit the President effectively to carry out his constitutionally assigned responsibilities. The executive power resides in the President, and he is obligated to take care that the laws are faithfully executed. In order to fulfill those responsibilities, the President must be able to rely upon the faithful service of subordinate officials. To the extent that Congress or the courts interfere with the President's right to control or receive effective service from his subordinates within the Executive Branch, those other branches limit the ability of the President to perform his constitutional function.

*Authority of HUD's CFO*, 28 Op. O.L.C. at 252 (internal quotation marks and citations omitted).

### 2.

The constitutional authorities outlined above lead to the conclusion that section 802(e)(1) would be unconstitutional if applied to prevent the CPO from incorporating into his final report comments and amendments suggested by the President's review of the report through the President's subordinates at DHS and OMB. The very statute that contains section 802(e)(1) establishes the CPO as a subordinate officer accountable to the Secretary and ultimately to the President, and vests the CPO with a broad range of policymaking and operational authority within the Executive Branch. 6 U.S.C. § 142(a)–(c) (Supp. I 2007). Section 802 expressly designates the CPO as the "senior official in the Department" who has "primary responsibility for privacy policy," which includes responsibility for "assuring" departmental compliance with "privacy protections," particularly those contained in the information handling requirements of the Privacy Act of 1974, as well as

responsibility for "evaluating legislative and regulatory proposals involving collection, use, and disclosure of personal information by the Federal Government." 6 U.S.C. § 142(a)(1)–(3). Additional provisions in section 802 further vest the CPO with broad authority to coordinate the implementation of "programs, policies, and procedures involving civil rights, civil liberties, and privacy considerations," *id*. § 142(a)(5), and with authority to investigate and report on, with "access to all records, reports, audits, reviews, documents, papers, recommendations, and other materials available to the Department," *id.* § 142(b)(1)(A), the "activities of the Department that affect privacy, including complaints of privacy violations, implementation of the Privacy Act of 1974, internal controls, and other matters," *id.* § 142(a)(5); *see also id.* § 142(a)(6), (b)–(c).

The CPO's responsibilities establish the CPO as the kind of Executive Branch officer with "broad statutory responsibilities" and "executive branch policy" authority that the Supreme Court "had no occasion to consider" in *Morrison*, *Constitutional Separation of Powers*, 20 Op. O.L.C. at 169, but who clearly falls within the class of "'purely executive' officials" over whom *Myers* concluded the President must be able to exercise full supervision in order to "accomplish his constitutional role." *Morrison*, 487 U.S. at 689 (quoting *Myers*, 272 U.S. at 132–34). The CPO is an executive officer who assists the President in performing functions—most notably the execution of statutes and the formulation of Executive Branch policy and legislative recommendations, *see* 6 U.S.C. § 142(a), (c)(1)(A), (d)—that lie at the core of the President's constitutional duties under Article II. *See Morrison*, 487 U.S. at 689–90; *Constitutional Separation of Powers*, 20 Op. O.L.C. at 169. For this reason, the Constitution requires that the President be able to supervise the CPO's activities, including and especially the CPO's communications with Congress, without legislative interference. *See, e.g.*, *Constitutionality of Direct Reporting*, 6 Op. O.L.C. at 633 ("The separation of powers requires that the President have ultimate control over subordinate officials who perform purely executive functions and assist him in the performance of his constitutional responsibilities. This power includes the right to supervise and review the work of such subordinate officials, *including the reports issued either to the public or to Congress*.") (emphasis added).

Section 802(e)(1) substantially interferes with the President's ability to exercise this constitutional authority to the extent it purports to bar the CPO from revising his report to reflect comments from the DHS or OMB officials through whom the President supervises the CPO and his reports. The fact that section 802(e)(1) expressly prohibits only comments or amendments by DHS and OMB officials, not comments by the President or other Executive Branch officials, does not change the constitutional analysis. It is well settled that the President must rely upon Executive Branch subordinates in order to "accomplish his constitutional role." *Morrison*, 487 U.S. at 690; *Myers*, 272 U.S. at 133; *Williams v. United States*, 42 U.S. (1 How.) 290, 297 (1842); *Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 306 n.12 (1989); *Opinion on*

*Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 479 (1855). And it is similarly well settled that frustrating the President's ability to rely on his subordinates unconstitutionally interferes with the President's authority under Article II. *See Myers*, 272 U.S. at 132–34; *Morrison*, 487 U.S. at 689–90.

The President relies upon DHS and OMB not only to assist him in supervising the CPO and the CPO's reports to Congress, but also in exercising his constitutional authority over the matters the CPO's report addresses, most notably the execution of privacy laws and policies. In purporting to prohibit the CPO from incorporating DHS or OMB comments in his report, section 802(e)(1) directly interferes with the President's ability to supervise the manner in which the CPO— a subordinate who qualifies as the type of "purely executive officer" over whom the Supreme Court has said the President must retain full supervisory authority— reports to Congress on the Executive Branch's handling of matters (most notably the execution of privacy laws and the development of privacy policy and legislative proposals) for which the President is constitutionally responsible. Such interference is impermissible regardless of its purported oversight or other justifications. Broad though Congress's powers are, Congress may not exercise those powers "in ways that violate constitutional restrictions on its own authority or that invade the constitutional prerogatives of other branches." *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification For Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261 (1989). Because section 802(e)(1) would effect precisely such an invasion if applied to require the CPO to exclude from his report comments that the President's review, through DHS or OMB, contemplates be incorporated, we conclude that the Executive Branch need not enforce the provision in such circumstances.

### 3.

For the reasons set forth above, the conclusion that certain applications of section 802(e)(1) would interfere with the President's ability to supervise the CPO is constitutionally problematic regardless of Congress's justifications for the provision. We note, however, that even if it were appropriate for us to balance Congress's purported need for an unedited report against the degree to which section 802(e)(1)'s prohibition on editing would impair the President's Article II functions, we would conclude that Congress's asserted interest fails to justify the restrictions that section 802(e)(1) places on the President's authority. *Cf. Morrison*, 487 U.S. at 695 (balancing Congress's interest in restricting the President's ability to remove an independent counsel against the degree to which the re-

strictions would "prevent the Executive Branch from accomplishing its constitutionally assigned functions").[7]

The 9/11 Act's text and legislative history do not establish any congressional need for direct reporting, much less that direct reporting "is demonstrably critical to the responsible fulfillment of [the requesting committee's] functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *compare Morrison*, 487 U.S. at 693 (emphasizing that the challenged statutory limits on the President's removal authority were determined to be "essential, in the view of Congress, to establish the necessary independence of the office"). But even were we to assume that section 802(e)(1) serves a compelling congressional oversight need, applying the provision to preclude the CPO from incorporating DHS or OMB comments on a report would "unduly trammel[] executive authority" under the kind of balancing framework the Court employed in *Morrison*. The reason is that applying the provision in this manner would, unlike the removal restrictions in *Morrison*, interfere with the "President's need to control the exercise of" a subordinate Executive Branch officer's authority

---

[7] We do not read *Morrison* to require such balancing here because, as we explained in Part II.C.1, *supra*, the Court's opinion in *Morrison* does not affect the analysis of the constitutional problem with legislative provisions that, like section 802(e)(1), interfere with the President's authority to supervise traditional Executive Branch officers like the CPO. *See Morrison*, 487 U.S. at 691.

Nor do we read the *Nixon* cases cited in our 1982 opinion as requiring us to evaluate section 802(e)(1)'s constitutionality in light of Congress's "need" for the unedited report the provision purports to require. It is true that our 1982 opinion analyzed the constitutionality of imposing a concurrent reporting obligation on the FAA in terms of whether the requirement was supported by a "very compelling and specific [legislative] need." 6 Op. O.L.C. at 633, 641–42. This approach was, however, a departure from the Office's prior opinions objecting to direct reporting requirements regardless of their oversight value. *See, e.g.*, *Inspector General Legislation*, 1 Op. O.L.C. at 17–18. Since 1982, our opinions and advice regarding the constitutionality of direct and concurrent reporting requirements have returned to the approach we employed in 1977. *See, e.g.*, *Common Legislative Encroachments*, 13 Op. O.L.C. at 255 (concluding, without considering oversight or other justifications, that concurrent reporting requirements should be opposed on constitutional grounds if proposed in legislation, and that "if enacted," these provisions should be "construed as applying only to 'final' recommendations that have been reviewed and approved by the appropriate superiors within the Executive Branch, including OMB"); Letter for William V. Roth, Chairman, Committee on Finance, United States Senate, and Bill Archer, Chairman, Committee on Ways and Means, United States House of Representatives, from L. Anthony Sutin, Acting Assistant Attorney General, Office of Legislative Affairs at 4 (June 8, 1998) (raising constitutional objections to direct reporting provisions without considering their oversight or other legislative value); *Authority of Agency Officials*, 28 Op. O.L.C. 79 (explaining that a direct reporting provision posed constitutional problems without regard to whether the provision served legitimate oversight or other needs); *Authority of HUD's CFO*, 28 Op. O.L.C. 248 (same). That is also the approach we apply here, because the relevant portion of the 1982 opinion rests on authorities that balance Congress's need for information with the "practical need for confidentiality in Executive Branch deliberations," not with the constitutional principles that have long been held to preclude legislative interference with the President's authority to supervise traditional Executive Branch officers. *See* 6 Op. O.L.C. at 638–41; *see also id*. at 640 n.3 (emphasizing that this Office knew of no instance in which Congress had imposed the type of concurrent reporting requirement at issue in the opinion "upon a purely executive agency that is under the President's direct supervision and control").

on issues (the execution of federal statutes, Executive Branch policy formulation, and the protection of privileged information) that are "central to the functioning of the Executive Branch." *Id*. at 691.

As noted, the President cannot effectively perform his constitutional functions without the aid of Executive Branch agencies and officers. *See, e.g.*, *Myers*, 272 U.S at 133. The CPO is such an officer, and DHS and OMB are such agencies. Indeed, they are the agencies best able (and, in DHS's case, uniquely able, because the report pertains largely to DHS activities) to assist the President in discharging his constitutional authority to supervise not just the CPO and his reports, but also the Executive Branch's handling of the matters addressed in those reports. The statute requires that the CPO's reports address DHS's implementation of federal privacy laws, as well as Executive Branch privacy policy and legislative recommendations on privacy issues. *See* 6 U.S.C. § 142(a), (e). Section 802(e)(1)'s prohibition on the incorporation of DHS or OMB comments into the report would deprive the President of his ability to ensure that a report to Congress on privacy matters on behalf of the Executive Branch reflects the input of the Executive Branch officers on whom the President relies to discharge his constitutional authority over the report, the officer who transmits it, and the substantive matters that the report addresses. Section 802(e)(1)'s prohibition on incorporating OMB comments in the CPO's report to Congress would also deprive the President of the benefits of the OMB review process that Presidents have relied upon for decades to ensure that a single officer's or department's communications to Congress do not conflict with the President's policy program or legal obligations, and also do not compromise constitutionally privileged information or otherwise undermine the President's ability to exercise his constitutional authority. *See* OMB Circular No. A-19, ¶¶ 3–4, 8 (1979). Because certain applications of section 802(e)(1) would impose these substantial burdens on the President's ability to exercise his constitutional supervisory authority, we would consider those applications of the provision constitutionally objectionable even if we were to balance the degree to which they burden the President's Article II authority against the provision's oversight or legislative value.

### 4.

Certain applications of section 802(e)(1) would also conflict with the President's constitutional authority to protect against the unauthorized disclosure of classified and other types of constitutionally privileged information.

We have long concluded that statutory provisions that purport to authorize Executive Branch officers to communicate directly with Congress without appropriate supervision by the President or his subordinates violate the separation of powers because such provisions infringe upon the President's constitutional authority to protect against the unauthorized disclosure of constitutionally privileged information, most notably classified national security information. As

the Clinton Administration explained in a 1998 Statement of Administration Policy ("SAP") on S. 1668, a bill that purported to give employees in the intelligence community a right to disclose certain types of privileged information to Congress without Presidential authorization:

> This provision is clearly contrary to the Supreme Court's explicit recognition of the President's constitutional authority to protect national security and other privileged information. Congress may not vest lower-ranking personnel in the Executive branch with a "right" to furnish national security or other privileged information to a member of Congress without receiving official authorization to do so. By seeking to divest the President of his authority over the disclosure of such information, S. 1668 would unconstitutionally infringe upon the President's constitutional authority.

This Office further developed the position stated in the SAP in testimony before Congress. *See Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92 (1998) (reproducing the relevant testimony).

The President's constitutional authority to protect against the unauthorized disclosure of privileged information is not "limited to classified information, but extends to all deliberative process or other information protected by executive privilege." *Authority of Agency Officials*, 28 Op. O.L.C. at 81. "Because [a] statute[] may not override the constitutional doctrine of executive privilege, [it] may not act to prohibit the supervision of the disclosure of any privileged information, be it classified, deliberative process or other privileged material." *Id.* Applying this principle, we have consistently advised that the President's ability to protect against the unauthorized disclosure of information potentially protected by executive privilege may not be restricted by statute. *See, e.g.*, Memorandum for Peter J. Wallison, Counsel to the President, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel at 3 n.6 (Sept. 8, 1986) ("Consistent with our view that Congress cannot override executive privilege by statutory enactment, we do not believe the 'whistleblower' provisions allow an employee to escape sanctions for disclosure of material covered by executive privilege."). More importantly here, we have concluded in the specific context of statutory reporting requirements that "the Constitution compels that the head of [a] department must have the authority to direct" subordinates preparing reports to Congress to "make whatever modifications are deemed necessary" to prevent the unauthorized disclosure in those reports of sensitive law enforcement or executive privileged information. *Legislation to Establish Offices of Inspector General—H.R. 8588*, Hearings before the Subcomm. on Governmental Efficiency and the District of Columbia of the S. Comm. on Governmental Affairs, 95th Cong. 141 (1978) (testimony of Lawrence A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel) ("Hammond Testimony"); *see also* Memorandum for Robert M.

McNamara, Jr., General Counsel, Central Intelligence Agency, from Todd D. Peterson, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legal Authority to Withhold Information from Congress* at 3 (Sept. 9, 1998) (the "application of [statutory] reporting requirements . . . is limited by a constitutional restraint—the executive branch's authority to control the disclosure of information when necessary to preserve the Executive's ability to perform its constitutional responsibilities"). As we explained 30 years ago:

> This conclusion springs, first, from the President's duty to see that the laws are faithfully executed. His immediate subordinates are charged with carrying out that constitutional duty. If a department head discovers in a report that, for instance, grand jury or tax return information has been . . . included, it is his duty to see that it is deleted. This is the simplest and clearest case. In each case an enactment having the force of law prohibits disclosure—even to Congress—and for the department head to allow a report to go out without alteration would be to disregard those enactments and fail in the faithful execution of the laws.
>
> . . . .
>
> In addition . . . , there are some limited circumstances in which it has been recognized that the President may restrict the disclosure of confidential information and information relating to national security, diplomatic and military secrets . . . . [I]f an [Executive Branch subordinate] decides to disclose confidential information, the head of the department should have the opportunity to review that intended disclosure and initiate the process of internal Executive Branch scrutiny to determine whether the President should be asked to make the decision to withhold that document or portions of it from Congress. Any law which interferes with the President's power to make these sorts of deliberative judgments would, in the Department's opinion, offend the core concept of separation of powers upon which the Supreme Court based its recognition of a Presidential privilege.

Hammond Testimony at 141–43. Congress acknowledged the foregoing constitutional principles in the Senate report on the legislation (the Inspector General Act) addressed in the Department's testimony. S. Rep. No. 95-1071, at 32, 1978 U.S.C.C.A.N. at 2707 ("Insofar as [executive privilege] is constitutionally based, the committee recognizes that section 5(b) cannot override it.").

There is no question that section 802(e)(1) would interfere with the President's ability to protect against the unauthorized disclosure of privileged information if applied to preclude the CPO from accepting DHS or OMB amendments made to protect such information. If section 802(e)(1) were so applied, it would substan-

tially constrain the President's ability to protect against the unauthorized disclosure of privileged information by limiting the Executive Branch subordinates and processes on which the President may rely, and typically does rely, to exercise his constitutional authority over such information. To that extent, as well, the statute as so applied would be unconstitutional.

### III.

In summary, we conclude that section 802(e)(1) does not prohibit DHS or OMB officials from reviewing, in accordance with established Executive Branch review and clearance procedures, the CPO's draft section 802 reports before the reports are submitted to Congress. We further conclude that section 802(e)(1) is best interpreted not to prohibit DHS or OMB officials from commenting upon a draft CPO report where the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect comments or amendments from such officials. Finally, we conclude that section 802(e)(1)'s direct reporting requirement need not be enforced in circumstances where its application would require the CPO to ignore the results of the President's review, through DHS and OMB, of a particular report. In such circumstances, the statute must yield to the President's exercise of his constitutional authority to supervise subordinate Executive Branch officers and their communications with Congress. In the event DHS were to implement this conclusion by adopting a policy not to enforce section 802(e)(1) in the circumstances described above, DHS should report the policy to Congress as required by 28 U.S.C. § 530D.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
